# UNITED STATES *v.* MISSION ROCK COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 198. Argued March 11, 1903.—Decided April 13, 1903.

The State of California upon its admission into the Union acquired absolute
property in, and dominion and sovereignty over, all soils under the tide-
waters within her limits, with the consequent right to dispose of the
title to any part of said soils in such manner as she might deem proper,
subject to the paramount right of navigation over the waters, so far as
such navigation might be required for the necessities of commerce with
foreign nations or among the several States, the regulation of which is
vested in the general government. *Shively* v. *Bowlby*, 152 U. S. 1.

The State of California pursuant to an act of legislature issued its patent
in 1872 for certain submerged lands in San Francisco Bay, about fourteen
acres and upwards, which the patentee's grantees improved by filling in
and building docks and warehouses. Within the boundaries were two
small rocks or islands one fourteen one hundredths of an acre and the
other one one hundredth of an acre in area. In 1899 the President made

an order reserving the two rocks and describing them as of the above mentioned fractional acreage for naval purposes. The United States demanded possession of the original islands and of the adjacent property appurtenant thereto.

*Held,* That as to all the premises except the two rocks or islands, which were awarded to the United States, the grantee under the state patent had good title and could not be ejected.

*Held,* That in the absence of explicit directions the President's order could not be construed as appropriating such valuable property as that adjacent to the rocks and islands as being appurtenant thereto.

EJECTMENT brought in the Circuit Court of the United States, Ninth Circuit, Northern District of California, by the United States against the California Dry Dock Company. Pending the hearing the latter company sold and transferred its title to the Mission Rock Company, a corporation, which thereupon entered into possession of the property. By stipulation the Mission Rock Company was substituted as defendant, and an amended and supplemental complaint was filed.

The property sued for was described by metes and bounds, and it was alleged constituted a " tract of land, being a square, including the rock known as Mission Rock, and containing 14.69 acres, more or less, and being a fractional part of the westerly half of section 11, township 2 south, range 5 west, Mount Diablo base and meridian." Damages and rents and profits were also prayed in the sum of $355,000.

By consent the case was tried by the court, and its findings as far as material are as follows:

" II. At the date of the admission of the State of California into the Union the premises sued for consisted of two rocks or islands adjacent to one another and projecting above the plane of ordinary high water in the Bay of San Francisco, the larger of which rose to a height of more than twenty and less than forty feet above such high water. Also of other lands contiguous thereto and surrounding said rocks or islands which were completely submerged and over which the daily tides continuously flowed and ebbed. The rocks or islands referred to are laid down on the chart in this cause and marked Exhibit ' A.'

" III. The areas of these rocks or islands above ordinary high water mark at the time of the admission of the State of Cali-

fornia into the Union were as follows : The one on the chart called 'Mission Rock' had an area of fourteen one hundredths (14–100) of an acre; the other had an area of one one hundredth (1–100) of an acre.   These rocks or islands rose abruptly out of the Bay of San Francisco.   Their sides to the extent that they were covered and uncovered by the flow and ebb of the tide varied from ten to twenty-five feet, depending on their steepness.   Both rocks were barren, without soil or water, and were of no value for purposes agricultural or mineral.   They lay at a distance of about half a mile of the then shore line of that part of the bay upon which the city of San Francisco fronted. Navigable water divided and still divides the lands sued for from the mainland and surrounded and now surrounds them.

"IV. The lands described in the complaint were not, at the date of the admission of the State of California into the Union, within the boundaries of any valid private or pueblo grant of lands of the Spanish or Mexican governments.

"V. No approved plat of the exterior limits of the city of San Francisco as provided by the terms of section 5 of the act of July 1, 1864, 13 Stat. 332, has been filed or rendered to the General Land Office of the United States, or of the State of California.   The lands sued for in this action are within such exterior limits.

"VI. On the thirteenth day of January, 1899, the President of the United States, purporting to act in conformity with the act of July 1, 1864, already referred to, issued the following order :

"'EXECUTIVE MANSION, *January* 13, 1899.

"'It is hereby ordered that the Mission Island and the small island southeast thereof, designated on the official plat on file in the General Land Office, approved October 12, 1898, as lots 1 and 2 of section 11, township 2 south, range 5 west, Mount Diablo meridian, California, containing, according to the plat, fourteen one hundredths of an acre and one one hundredth of an acre, respectively, be, and they are hereby, declared as permanently reserved for naval purposes.

"'WILLIAM MCKINLEY.'

"VII. On the          day of March, 1864, the United States surveyor general for the State of California extended the public survey so as to comprehend and include the rocks or islands and the lands in controversy in the present suit.

"VIII. On April 4, 1870, the governor of the State of California approved an act of the legislature of the State entitled 'An act to provide for the sale and conveyance of certain submerged lands in the city and county of San Francisco to Henry B. Tichenor,' which act was printed in the statutes of California for the years 1870–1871, at page 801, is hereby referred to and made part hereof.

"The lands herein described include the lands sued for in this action.

"On the 11th day of July, 1872, the State of California, in conformity with said act, issued its patent for the said lands to said Henry B. Tichenor, purporting to convey the same to him. Said patent was duly recorded in liber 1 of Records of Patents, page 66.

"After execution of the said patent the said Tichenor executed and delivered a deed of grant, bargain and sale, dated May 1, 1878, purporting to convey the said lands to the California Dry Dock Company, which thereafter, on the 6th day of June, 1900, executed and delivered to the Mission Rock Company, the defendant, a like deed to the said lands. The last-named company has not since said date conveyed to any person or corporation the said lands.

"IX. The California Dry Dock Company, upon going into possession of said lands so conveyed, undertook the improvement of the same by filling in portions of the submerged lands immediately around and contiguous to said islands or rocks, with many thousands of tons of rock, thus increasing the available area of said lands to about four acres, upon which extensive warehouses were built by it, and wharves erected for the accommodation of shipping.

"Since the issuance of the state patent hereinbefore referred to the patentee thereof up to May 1, 1878, the California Dry Dock Company from said time to the 6th day of June, 1900, and the defendant from said last-named date to the present

time, have been in continuous and uninterrupted possession of the said lands, using the same and the improvements thereon for commercial purposes, and claiming to be the absolute owner thereof."

The conclusion of the court was that the United States was entitled to the lands sued for, without damages or rents and profits, and judgment was entered accordingly.

The Circuit Court of Appeals reversed the judgment, and remanded the cause with instructions "to enter judgment for the plaintiff for the recovery of the possession of the two islands or rocks mentioned in the record, containing, respectively, fourteen one hundredths of an acre and one one hundredth of an acre, and designated on the official plat on file in the General Land Office, approved October 12, 1898, as lots 1 and 2 of section 11, township 2 south, range 5 west, Mount Diablo meridian, California; and as respects the remainder of the land sued for, that the plaintiff take nothing." 109 Fed. Rep. 763. This writ of error was thereupon sued out.

*Mr. Solicitor General Richards* for the United States.

I. Upon the acquisition of California from Mexico, under the treaty of Guadalupe Hidalgo, May 30, 1848, 9 Stat. 922, all the territory then belonging to Mexico became the property of the United States, both the tide lands and the upland. Excepting the lands which Mexico, prior to the treaty, had granted or in any way disposed of, the United States became the owner of all the land in California. The tide or submerged lands the United States took in trust for the future State of California. *San Francisco v. Le Roy,* 138 U. S. 656, 671; *Knight v. U. S. Land Association,* 142 U. S. 161, 183. All the rest it held in absolute ownership.

In all the cases where the land, under this doctrine, went to the original States when the Revolution took place, and to the subsequent States upon their admission to the Union, it was submerged land—land under water, not land above water. The submerged lands which went to the State were lands entirely under water. *Martin v. Waddell,* 16 Peters, 367; *Weber v. Board of Harbor Commissioners,* 18 Wall. 57; *Illinois Cen-*

*tral Railroad* v. *Illinois,* 146 U. S. 387; *Shively* v. *Bowlby,* 152 U. S. 1.

II. Conceding that, upon the admission of California into the Union, the State took and has since held the ownership of the tide lands, or the submerged lands, or the navigable waters with the soils under them, to be used in trust for the people in the furtherance of navigation and commerce, the island or islands known as Mission Rock remained the property of the United States, because they never had been nor are they now tide land, or submerged land, or soil under navigable waters.

The purchase of over fourteen acres of submerged land surrounding these rocks or islands shows conclusively that the rocks or islands were not submerged land. The submerged land was purchased because of the location of the islands. Without the islands, the soil under the navigable waters of the bay of San Francisco a half mile from shore would have been worthless. The submerged land was bought upon the condition that a marine railway and dry dock should be built at Mission Rock. This of itself is sufficient to show the possible use and value of this island, not as submerged land, but as " fast land," land above water, permanently fixed, and capable of a valuable commercial use. If valuable to a private individual or corporation for improvement as a site for docks and warehouses, Mission Rock was equally valuable to the United States as a site for naval, military, or commercial purposes. See *Commonwealth* v. *Shaw,* 14 S. & R. 9.

III. But it is insisted that upon the admission of California, all property " above and below high water," not reserved by the United States in the act of admission, passed to the State. This is novel doctrine, and cannot be sustained. *Newhall* v. *Sanger,* 92 U. S. 761; *Leavenworth Railroad Co.* v. *United States,* 92 U. S. 733; *Wilcox* v. *Jackson,* 13 Pet. 498; *Doolan* v. *Carr,* 125 U. S. 618; *Mann* v. *Tacoma Land Co.,* 153 U. S. 273; *Grisar* v. *McDowell,* 6 Wall. 363.

IV. That the title to Mission Rock and the adjacent island never passed to the State of California and still remains in the United States, is conclusively shown by the fact that, by the act under which the defendant claims, the State of California

never attempted to convey any title to it.   The act is entitled,
"An act to provide for the sale and conveyance of certain sub-
merged lands in the city and county of San Francisco to Henry
B. Tichenor."   It attempts to convey, not Mission Rock, but
only the submerged land inclosed in a square measuring 800
feet on each side, surrounding Mission Rock.   The island or
islands included in the square were, by clear implication, ex-
cluded from the proposed grant.

However the patent may read, it cannot extend the grant
made by the legislature, which is defined by the act.   Under
the act nothing but the submerged land, which was ascertained
by the survey to contain fourteen and thirty-five one hundredths
acres, was paid for and conveyed.   There is no ambiguity in
the act; but if there were, the doubt would be resolved against
the grantee.   All grants of this description are strictly con-
strued against the grantee; nothing passes but what is con-
veyed in clear and explicit language.   *Dubuque etc. R. R. Co.*
v. *Litchfield,* 23 Howard, 66, quoted with approval in *Leaven-
worth etc. R. R. Co.* v. *United States,* 92 U. S. 733, 740 ; *Rice*
v. *Railroad Co.,* 1 Black, 380 ; *Charles River Bridge* v. *Warren
Bridge,* 11 Peters, 420 ; *Delaware Railroad Tax Case,* 18 Wall.
206, 225.

V. The right by the grantee of the State to reclaim the sub-
merged lands surrounding Mission Rock being subordinate to
that of the United States as the owner of the island, no title
as against the United States ever passed by the patent or the
grant on which it was based.

VI. The State of California did not have unqualified owner-
ship over the submerged lands of San Francisco Bay.   It held
these lands in trust for the public.   It could only convey them
to be used for public purposes, and the only public purposes for
which these lands could be used was a purpose which required
the ownership and use of Mission Rock.   The State, therefore,
had no power to convey the lands to be held distinct from
Mission Rock and in opposition to the title of the United States
to one of its islands.   *Shively* v. *Bowlby,* 152 U. S. 1, distin-
guished; *Stockham* v. *Browning,* 18 N. J. Eq. 390 ; *Blakslee
Mfg. Co.* v. *Blakslee &c. Works,* 129 N. Y. 155.

VII. Before California was admitted into the Union, the United States might have granted Mission Rock, and, along with it, the right to use the submerged land and the navigable waters covering it, which surrounded the island. It might have granted Mission Rock and the submerged land about it for use for the purposes set out in the California act relied on in this case. But the United States preferred to reserve Mission Rock for national uses. When the United States reserved Mission Rock for national uses, it also reserved the right to use the surrounding navigable waters and submerged land, for without them no national use could be made of the island. *United States* v. *Bellingham Bay Boom Co.*, 176 U. S. 211, 215; *Scranton* v. *Wheeler*, 179 U. S. 141.

VIII. The United States had the absolute and unqualified ownership of Mission Island. The United States might have sold Mission Island to any individual and conveyed an absolute title. What would this absolute title to Mission Island have included? To determine this, the nature and location of the island must be considered. It was situated in the bay of San Francisco, half a mile from the shore, surrounded by navigable waters. It was not susceptible of cultivation. It contained no mineral except the rock of which it was composed. It was valuable only for use for war, naval, or commercial purposes, as a site for a fort, a coaling station, warehouses and docks, etc. To be used for any of these purposes it was necessary that access should be had from the island to the navigable waters surrounding it; and for this purpose that the contiguous submerged land should be filled up and docks and wharves constructed. This right of access was a property right incident to the ownership of the island. *Dutton* v. *Strong*, 1 Black, 1 (1861); *Weber* v. *Board of Harbor Commissioners*, 18 Wall. 57; *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387; *Yates* v. *Milwaukee*, 10 Wall. 497; *R. R. Co.* v. *Schurmeir*, 7 Wall. 272; *Lake Superior Land Co.* v. *Emerson*, 38 Minnesota, 406; *Hanford* v. *St. Paul &c. R. R. Co.*, 43 Minnesota, 104; *Union Depot &c.* v. *Brunswick*, 31 Minnesota, 297; *Clement* v. *Burns*, 43 N. H. 609; *Bell* v. *Gough*, 23 N. J. L. 624; *Providence Steam Engine Co.* v. *Providence Steamship Company*, 12 R. I. 348, 363; *New*

*Jersey Zinc and Iron Co.* v. *Morris Canal Co.*, 44 N. J. Eq. 398; *Goodsell* v. *Lawson*, 42 Maryland, 348, 362; *Nichols* v. *Lewis*, 15 Connecticut, 137; *Scranton* v. *Wheeler*, 179 U. 141.

IX. The improvements made at Mission Rock were of such character that they necessarily became, when made, a part of the island itself, impossible to be separated, and therefore the property of the owner of the island. The right of the United States to recover the island consequently carries with it the right to recover the property attached to and made a part of the island. *Ledyard* v. *Ten Eyck*, 36 Barbour, 102; *Nichols* v. *Lewis*, 15 Connecticut, 137, and cases cited.

X. It is stated in the third finding that in 1850, when California was admitted into the Union, Mission Rock had an area above high water mark of fourteen one hundredths of an acre, and the adjacent rock or island an area of one one hundredth of an acre.

It is now conceded that by depositing many thousand tons of rock on the submerged land under the shallow water around and contiguous to Mission Rock and the adjacent island, the area has been increased to about four acres.

The United States is entitled to recover the entire area claimed by the defendant company, that is, the fourteen and sixty-nine one hundredths acres, because that amount is claimed by the defendant, is held in possession by the defendant, and if necessary to the defendant in order to occupy and use Mission Island, it is equally essential to the United States.

To recover Mission Rock as it once stood would be a victory as barren as the rock itself. *Martin* v. *Waddell*, 16 Peters, 367; *Den* v. *Jersey Co.*, 15 Howard, 426; *Frisbie* v. *McClernin*, 38 California, 568; *Coburn* v. *Ames*, 52 California, 385.

XI. As to the action of the government officer who fixed the harbor or dock lines surrounding Mission Island, that officer acted simply upon the visible facts presented to him. Having no authority to determine questions of title, his action can in nowise be held to estop the government.

XII. The order of the President may be read without reference to the act of July 1, 1864. If, as the Circuit Court of Appeals held, this act had no relation to Mission Rock and the

adjacent islands, " which were and are far outside of the pueblo grant of lands claimed by and confirmed to the city," the order of the President may be read, not as a reservation under that act, but as an appropriation of Mission Island and the small island southeast thereof, with the shores, contiguous submerged land, and navigable water appurtenant thereto, permanently for naval purposes.   An appropriation, not in the sense of a condemnation for public purposes of private land, but as a designation of the particular public use to which these islands, long set apart from sale, were to be finally and permanently devoted.   See *Grisar* v. *McDowell*, 6 Wallace, 363, 381; Opinion Attorney General MacVeagh, 17 Opinions, 160.

If a private corporation had without authority filled in the land and constructed permanent wharves, piers, docks, etc., making them a part of the islands, then the reservation operated as an appropriation of these additions to the realty, for reasons before stated.

If there are any equitable claims to compensation on the part of the defendant, growing out of the cost of the improvements made, these may safely be left to the consideration of Congress.

*Mr. Charles Page*, with whom *Mr. Edward J. McCutchen* and *Mr. Samuel Knight* were on the brief, for defendants in error.

I. The submerged or tide lands became the property of the State on its admission.   This right of property included the right to dispose of the land in its discretion, subject only to the right of control by the national government, if such disposition should interfere with the primary use of the waters over them as a means of commerce.   *Pollard's Lessee* v. *Hagan*, 3 Howard, 221; *Shively* v. *Bowlby*, 152 U. S. 1; *Illinois Central Railroad* v. *Illinois*, 146 U. S. 434; *Fort Leavenworth Co.* v. *Lowe*, 114 U. S. 526; *Martin* v. *Waddell*, 16 Peters, 414; *San Francisco* v. *Le Roy*, 138 U. S. 671; *Knight* v. *United States Land Association*, 142 U. S. 186; *Weber* v. *Harbor Commissioners*, 18 Wallace, 65; *Lowndes* v. *Huntington*, 153 U. S. 1.   The *Illinois* case further holds that the fact that there is no tide land in

the Great Lakes, does not affect the right of the State.   That right is the right to the soil under its navigable waters, 146 U. S. 436.   See also *Morris* v. *United States,* 174 U. S. 236; *Mann* v. *Tacoma,* 153 U. S. 273 ; *Knight* v. *United States Assn.,* 142 U. S. 183; *Hardin* v. *Jordan,* 140 U. S. 381; *Packer* v. *Bird,* 137 U. S. 382; *Co. of St. Clair* v. *Lovingston,* 23 Wall. 64–68 ; *Barney* v. *Keokuk,* 94 U. S. 336–338 ; *Gilman* v. *Philadelphia,* 3 Wall. 726 ; *Mumford* v. *Wardwell,* 6 Wall. 436 ; *Smith* v. *Maryland,* 18 How. 74; *Goodtitle* v. *Kibbe,* 9 How. 471 ; *Pacific Gas Co.* v. *Ellert,* 64 Fed. Rep. 434 ; *Oakland Water Front Case,* 118 California, 182.   The claim of ownership in such lands is recognized by the statute of the State in the Civil Code, sec. 670.

The right of the State to its navigable waters includes the right to the fish in them and the use of the beds for the planting of oysters to the exclusion of the citizens of other States. *Macready* v. *Virginia,* 94 U. S. 391 ; *Smith* v. *Maryland,* 18 How. 74; *Trustees* v. *Lowndes,* 40 Fed. Rep. 630.

The United States may appropriate tide lands though sold by the State, if the necessities of commerce shall require them, but if they have been improved they can be taken only upon due compensation made.   *Scranton* v. *Wheeler,* 57 Fed. Rep. 812 ; *Monongahela* v. *United States,* 148 U. S. 312 ; *Assante* v. *Charleston Bridge Co.,* 41 Fed. Rep. 365 ; *Rhea* v. *Newport,* 50 Fed. Rep. 16 ; *Willamette Bridge Co.* v. *Hatch,* 125 U. S. 1 ; *Mobile* v. *Kimball,* 102 U. S. 699.

The lands covered by tidewaters were the property of the State, and the State's title, conveyed to Tichenor, and thereafter conveyed to the Mission Rock Company, vested in the latter absolute dominion therein, subject only to such regulations of the United States with reference to the keeping open of navigable channels as its officers might make.   These have been made and complied with.

If the title to the submerged lands vested in the defendant in error and its predecessor, they had the right to improve them by filling in, and the area thus made available by being brought above the water level, belongs to the grantee of the State re-

gardless of the ownership by the United States of lands adjoining such submerged lands, if there be such ownership.

II. "Mission Rock" and the adjacent rocks, caps above the water's surface, were and are parts of the tidal lands, within the meaning of the constitutional principle which gives to each of the sovereign States its navigable waters and the soils under them. *Pollard* v. *Hagan*, 3 How. 230; *Shively* v. *Bowlby*, 152 U. S. 1.

III. The admission of the State on an equal footing with the original States gave to it all property above and below high water, not already given into private ownership or not reserved by the United States in the act of admission. The reservation in that act was of " public lands." These rocks were not " public lands." *Nichols* v. *City of Boston*, 98 Massachusetts, 42; *Shively* v. *Bowlby*, 152 U. S. 1; *People* v. *Godfrey*, 17 Johns. 230; *Fort Leavenworth* v. *Lowe*, 114 U. S. 538; *Pollard's Lessee* v. *Hagan*, 3 How. 223; *Mann* v. *Tacoma Co.*, 153 U. S. 273; *Newhall* v. *Sanger*, 92 U. S. 761, 763; *Leavenworth etc. Railroad* v. *United States*, 92 U. S. 733; *Doolan* v. *Carr*, 125 U. S. 618; *Morris* v. *United States*, 174 U. S. 237; *Barney* v. *Keokuk*, 94 U. S. 324, 338; *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387.

If the foregoing cases establish the rule that no settlement could lawfully be made on Mission Rock under the preëmption or homestead acts, it is clear that the rock is not " public land." *State* v. *Pacific Guano Co.*, 22 S. C. 50; *Allegheny* v. *Read*, 24 Pa. St. 39.

IV. The act of 1864 did not relinquish any claim of the United States to tidal lands or to rocks in the bay. The act referred to lands on the mainland, hence the President's reservation of " Mission Rock " was nugatory.

V. Assuming that " Mission Rock " was included in the meaning of the act, then the title passed to the city of San Francisco. It has not since been revested in the United States, so that the latter can maintain ejectment for the rock.

Ejectment cannot possibly lie to recover lands, the title to which has been conveyed by the plaintiff subject to an exception which is undefined in the grant. The exception was void

for uncertainty. *Brown* v. *Allen*, 43 Maine, 590; *Mooney* v. *Cooledge*, 30 Arkansas, 640; *Darling* v. *Crowell*, 6 N. H. 421; *Andrews* v. *Todd*, 50 N. H. 565; *Waugh* v. *Richardson*, 30 N. C. 470; *S. C.*, 8 Iredell, 470; *Benn* v. *Hatcher*, 81 Virginia, 25; *Butcher* v. *Creel's Heirs*, 9 Gratt. 201; *Shoenberger* v. *Lyon*, 7 W. & S. 184; *Stambaugh* v. *Hollabaugh*, 10 S. & R. 357.

We have not entered into a discussion of littoral rights or those of accretion. These are clearly inapplicable, whatever the law may be, *first*, because the defendant in error is the undoubted owner of the lands surrounding the rocks upon which its predecessor created the area of land now above tidewater, which area is termed " accretions " by the government's counsel; *second*, because the President has not set apart the "accretions" by his order, but only the land containing fourteen one hundredths of an acre known as " Mission Island " and the " small island northeast thereof," which contains one one hundredth of an acre.

MR. JUSTICE McKENNA, after stating the case, delivered the opinion of the court.

" It will be observed," as was said by the Circuit Court of Appeals, " that the judgment of the Circuit Court was not limited to the two rocks or islands embraced in the executive order of January 13, 1899, the one covering fourteen one hundredths and the other one one hundredth of an acre, but awarded the government the entire tract of fourteen and sixty-nine one hundredths acres, including the warehouses and other improvements constructed by the defendant and its predecessors in interest." The Circuit Court of Appeals confined the recovery of the plaintiff to the rocks proper and awarded the submerged lands to the defendant. The controversy then is, which party has the title to the latter. The defendant in error is the successor of the rights and title of the California Dry Dock Company, that company being grantee of Henry B. Tichenor, who received the patent for the lands on the 11th of July, 1872, from the State of California, in pursuance of and in conformity with an act of the legislature of the State, entitled " An act

to provide for the sale and conveyance of certain submerged lands in the city and county of San Francisco to Henry B. Tichenor." Stat. California, 1869–70, p. 801.

Had the State the title to convey ? The plaintiff in error, in effect, contests this, and asserts besides a right to the submerged land as an easement appurtenant to the islands.

The title and dominion which a State acquires to lands under tidewaters by virtue of her sovereignty received elaborate consideration, exposition and illustration in the case of *Shively* v. *Bowlby*, 152 U. S. 1–58. Prior cases are there collected and quoted, among others, *Weber* v. *Commissioners*, 18 Wall. 57, 65. From the latter as follows (and the case concerned tide lands in California) : " Although the title to the soil under the tidewaters of the bay was acquired by the United States by cession from Mexico, equally with the title to the upland, they held it only in trust for the future State. Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion and sovereignty over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several States, the regulation of which was vested in the general government." And Mr. Justice Gray said, delivering the opinion of the court in *Shively* v. *Bowlby*: " Each State has dealt with the lands under the tidewaters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public."

This right is an attribute of the sovereignty of the State, and it follows that in the exercise of the right, as said by Mr. Justice Gray, the State may " dispose of its tide lands free from any easement of the upland proprietor." The facts of the case emphasized its doctrine. Shively was the owner of

the upland. Bowlby was the grantee of the State of Oregon of the tide lands in front of Shively's property. The grant was sustained. The sovereignty of California and the rights and powers dependent upon it are as complete as those of other States. How has California chosen to exercise them? In other words, what is the law of California as to the title and rights of riparian or littoral proprietors in the soil below high water mark? Upon the answer to these question the present litigation must be determined. The title papers of the defendant contain an act of the legislature of the State conveying the lands in controversy in private ownership, and the history of the State shows that the act was in accordance with the policy and practice of the State.

The legislature, commencing at the first session after the admission of the State into the Union, made grants of the tide lands to municipalities under conditions which contemplated their being conveyed to and held in private ownership. Among these was the act of March 26, 1851, known as the "Beach and Water Lot Act." It was entitled "An act to provide for the disposition of certain property of the State of California." Section 1 provided that "all the lots of land situated within the following boundaries according to the survey of the city of San Francisco, and the map or plat of the same now on record in the office of the recorder of the county of San Francisco, are known and designated in this act as the San Francisco Beach and Water Lots; that is to say, beginning at the point," etc. Then follows a description by streets, which includes a portion of the bay. Section 2 grants the use and occupation of the land for ninety-nine years and confirms grants of lands sold by authority of the ayuntamiento, or town or city council, or by any alcalde of said town or city; and section 4 makes the boundary line described in the first section a permanent water front of the city. These acts came up for consideration, and the character of the title conveyed was defined in *Smith* v. *Morse*, 2 California, 524; *Eldridge* v. *Cowell*, 4 California, 80, 87; *Chapin* v. *Bourne*, 8 California, 294; *Hyman* v. *Read*, 13 California, 445; *Holladay* v. *Frisbie*, 15 California, 630, 635;

*Wheeler* v. *Miller*, 16 California, 125; *City and County of San Francisco* v. *Straut*, 84 California, 124.

These cases all expressed under varying facts the validity of the title conveyed by the acts of the legislature. They are reviewed in *Pacific Gas Imp. Co.* v. *Ellert*, 64 Fed. Rep. 421.

In *Taylor* v. *Underhill*, 40 California, 473, Mr. Justice Temple said, speaking of lands below high water mark: "The State can probably sell the land and authorize the purchaser to extend the water front so as to enable him to build upon this land. . . ."

The decisions cover a period of many years and have become a rule of property and the foundation of many titles. As said by Circuit Judge Ross, delivering the opinion of the Circuit Court of Appeals: "A large and valuable part of the city of San Francisco, extending from the present water front to, in some places, Montgomery street, was at the time of and subsequent to the admission of California into the Union, a part of the submerged lands of the bay, but has since been filled in by many hundred grantors under the city and State, who have erected buildings and improvements thereon at costs running into many millions of dollars. All of this was done in aid of commerce, in the upbuilding of a great city upon the bay, and with the encouragement and consent of the general government."

There is nothing inconsistent with these views in *Shirley* v. *Bishop*, 67 California, 545; *People* v. *Gold Run Ditch and Mining Co.*, 66 California, 138, 151; or in *Heckman* v. *Swett*, 99 California, 303. In *Shirley* v. *Bishop* there was no question of riparian rights. The defendants attempted, under a franchise from the city of Benicia, to erect a wharf within three feet of the plaintiff's wharf, and parallel to it for sixty feet in the navigable waters of the straits of Carquinez, and beyond the water front, established by an act of the legislature of the State. The building of the wharf was restrained. The other two cases expressed the general doctrine that the title of the State to the lands covered by navigable waters is held in trust for the public. That doctrine is declared in all of the cases. It has a conspicuous illustration in the *Lake Front Case*, (*Illinois Central Railroad* v. *Illinois*,) 146 U. S. 387, 463. The doctrine and its limitations

are expressed in *Heckman* v. *Swett*, 99 California, 309, and in *Shively* v. *Bowlby*. The court said in *Heckman* v. *Swett:* "Navigable streams and the shores to ordinary high water mark are held by the State in trust for the public; but qualified rights therein may be granted, so far as they are not inconsistent with, or are in aid of the principal use, viz., for the purposes of navigation." In other words, the rights granted must be in aid of commerce; and it is recognized, as we have seen, in judicial decisions and established by practical examples that the conveyance by the State of its title to tide lands to be held in private ownership free from any easement of the upland proprietor, is in aid of commerce, and therefore in strict performance of the State's trust. See, in addition to the other cases, *Oakland* v. *Oakland Water Front Co.*, 118 California, 160.

2. A claim was made in the Circuit Court of Appeals by the plaintiff in error under section 5 of the act of Congress of July 1, 1864, entitled "An act to expedite the settlement of titles to lands in the State of California." 13 Stat. 333. By that section the title of the United States to the lands within the corporate limits of the city of San Francisco was relinquished and granted to the city "for the uses and purposes" specified in a certain ordinance of the city called the Van Ness ordinance, which ordinance had been ratified by the legislature of the State. Answering and disposing of the contention of the plaintiff in error, the Circuit Court of Appeals said: "Those uses and purposes . . . had no relation whatever to the rocks or islands here in controversy, which were and are far outside of the pueblo grant of lands claimed by and confirmed to the city." This is not contested here, but it is urged that "the order of President McKinley may be read, not as a reservation under that act, but as an appropriation of Mission Island and the small island southeast thereof, with the shores, contiguous submerged land, and navigable water appurtenant thereto, permanently for naval purposes." There are two answers to the contention. The order of the President explicitly designates the islands proper, and besides limits the areas appropriated to "fourteen one hundredths of an acre and one one hundredth of an acre respectively." At the time the order

was made the land in controversy had been reclaimed by the California Dry Dock Company, and upon it were "extensive warehouses," which had been built by that company, "and wharves erected for the accommodation of shipping." The property was so valuable that the plaintiff in error regarded itself damaged by its withholding in the sum of $250,000, and the rental thereof was alleged to be $5000 per annum. It is not conceivable that the President, by his order, intended to appropriate so valuable a property without explicit declaration, or to leave the appropriation to result as "appurtenant" to the rocks.

*Judgment affirmed.*