# GRAND RAPIDS AND INDIANA RAILROAD COMPANY *v.* BUTLER.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 198. Argued and submitted January 29, 1895. — Decided June 3, 1895.

The decision by a state court that the pleadings were sufficient to permit the examination and determination of the case presents no Federal question.

While the rule is that this court, upon a writ of error to the highest court of a State, in an action at law, cannot review its judgment upon a question of fact, it is unnecessary to consider the extent of the power of the court in that particular in chancery cases, as this court concurs with the result reached by the state court that when the survey was made of the land in controversy, there was no reservation made of the island, and no act on the part of the government showing any intention to reserve it.

In Michigan a grant of land bounded by a stream, whether navigable in fact or not, carries with it the bed of the stream to the centre of the thread thereof.

The court has no doubt, upon the evidence, that the circumstances were such at the time of the survey as naturally induced the surveyor to decline to survey the tract in controversy as an island; that there is noth-

ing to indicate mistake or fraud, and the government has taken no steps predicated on that theory; and that the judgment of the Supreme Court of the State of Michigan was right.

THIS was a bill filed by John Butler in the Circuit Court of the county of Kent, in the State of Michigan, against the Grand Rapids and Indiana Railroad Company and others, to quiet title to certain land in that county, resulting in a decree in complainant's favor, which was afterwards affirmed by the Supreme Court of the State, to review whose judgment this writ of error was sued out. The case is reported 85 Michigan, 246.

*Mr. T. J. O'Brien* for plaintiffs in error submitted on his brief.

*Mr. Willard F. Keeney,* (with whom was *Mr. Roger W. Butterfield* on the brief,) for defendant in error.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

The fractional north half of the southeast quarter of section 25, township 7 north, range 12 west, is located on the east bank of Grand River, and early in 1831 that part of the town lying east of the river was surveyed and subdivided, and the east bank of the river was meandered and surveyed. In 1837 the west bank of the river was meandered and surveyed, as were also four islands in the stream, designated as Islands Nos. 1, 2, 3, and 4; and that part of the town lying west of the river was surveyed and subdivided.

The north fractional half of the southeast quarter of section 25 was entered by Lyon and Hastings, September 25, 1832, and patent therefor issued to them November 5, 1833. Butler derived title under Lyon and Hastings, and claimed the land in dispute by virtue of riparian ownership, as taking, under the laws of Michigan, the bed of the stream to the thread thereof.

In 1855 a piece of ground in the river lying opposite land of which Butler's formed a part was surveyed and marked by the deputy surveyor Island No. 5 in Grand River. This sur-

vey purported to be made in pursuance of instructions given May 24, 1854, by the surveyor-general for Ohio, Indiana, and Michigan, whereby the deputy was authorized to survey the islands in certain lakes and in Grand River, Michigan, and was made in the third quarter of 1855. The verification by the deputy was in February, 1856, and by the chainmen November 22, 1856.

In 1871 the Grand Rapids and Indiana Railroad Company procured from the General Land Office a patent, which, with many thousand acres of land, covered Island No. 5 in Grand River, containing 2.56 acres, but this patent was not recorded until August 9, 1887, and on September 9 following this bill was filed.

Complainant put himself upon these two propositions: "First. At the time of the survey and sale of the lands on the bank the spot in question was not an island in fact, and was not treated by the authorities as such. Second. Whatever its character, inasmuch as it was not meandered or set apart as an island, it passed to the riparian proprietor as appurtenant to the grant of the lands on the bank."

The Supreme Court of Michigan said (p. 250): "A large mass of testimony was taken as to the character of this so called island at the time of the original surveys and for some years subsequent, the complainant's testimony tending to show that it was at first a low sand bar, covered a good part of the year with water, and the defendant's testimony tending to show that it was then a well-defined island. It is immaterial to determine what the facts are as to the condition of this land in those early days, for in our judgment it is of no consequence whether it was what might be termed 'an island' or a 'sand bar' or a 'piece of low, wet ground.' The law is the same in either case."

The court called attention to the surveys of 1831 and 1837, in neither of which was any island meandered or surveyed on the site of Island No. 5, and to the fact that in the survey of 1837 the acreage of the four islands and of the mainland was given, and observed: "In surveying Island No. 3 the surveyor began at the lower end of the island. The eleventh course

took him ' to maple on the head of island.' After taking his next course from the maple he made the following record: ' Channel between this and low willow isle 75 lks. wide and 3 feet deep opposite ft. of willow isle on left, 250 of low, wet ground on left to channel.' This ' low willow isle' is evidently what is now known as Island No. 5 as changed by the action of the water."

It was further stated : " The channel between the islands and the east bank was from seventy-five to one hundred feet wide. The channel between the islands and the west bank was several times wider. The depth of the water in each was about the same. The middle thread of the river was therefore west of the islands. About the year 1836 steamboats were placed on the river and docks were erected on the east bank nearly opposite Island No. 1. The principal business by boat was with the east side, where the city of Grand Rapids was situated. Steamboats also ran up the west channel to a steamboat warehouse on the west side of the river. About the year 1870 the east channel opposite Islands Nos. 1 and 2 was filled up, and the city constructed a sewer into and through that channel. The upper part of this channel was gradually filled, mainly by the owners of land upon the east bank. By these fillings this island has for some time been connected with and become a part of the mainland. The channel has been dredged out east of Island No. 3, and a steamboat slip and landing constructed, the upper end of which is a considerable distance below Island No. 5."

The court also found that Butler's possession of the premises was sufficient to maintain his suit, and some other matters were considered not necessary to be adverted to.

The court held that the well-recognized rule in Michigan was that a grantee of land bounded in the deed of conveyance by a stream takes title to the land under the water to the thread of the stream in the absence of an express reservation ; that reservation cannot be implied ; that when the government has surveyed its lands along the bank of a river and has sold and conveyed such lands by government subdivisions, its patent conveys the title to all islands lying between the meander line

and the middle thread of the river, unless previous to such patent it has surveyed such islands as governmental subdivisions or expressly reserves them when not surveyed; that the grant to Lyon and Hastings was made under the survey of 1831, by which, as the court found, " both banks of Grand River were meandered and by which the middle thread of the river was fixed west of this island;" and that the grant clearly vested in them title to the land in controversy, of which no subsequent survey by the government, could deprive them; that there was no force in the objection that this was equivalent to a proceeding to cancel the patent, since in this or any similar action, what was involved was the establishment of the fact that the title had passed by a former grant, and, therefore, that the government had no title to convey; in which cases courts protect purchasers from subsequent surveys.

The errors assigned are grouped by counsel, and stated thus: That the point that the land in question, even though an island, passed to Lyon and Hastings under their patent, if not reserved, was not properly before the court under the pleadings; that "the court erred in holding as matter of fact, on this record, that the island was not reserved in the Lyon and Hastings patent;" and that " the court erred in holding, upon this record, that Island 5 passed to Lyon and Hastings under the patent to them in 1833 of the north fraction of the southeast $\frac{1}{4}$ of section 25, township 7–12."

The state court held, however, the pleadings sufficient to permit of the examination and determination of the point on which its decision turned, and that conclusion involved no Federal question.

And as to the second, proposition, it may be said that while the rule is that this court, upon a writ of error to the highest court of a State, in an action at law, cannot review its judgment upon a question of fact, *Dower* v. *Richards*, 151 U. S. 658, it is unnecessary to consider the extent of the power of this court, in that particular, in chancery cases, as we entirely concur in the result reached by the state court that there was no such reservation, and in its findings as follows: "In the present case there is no act on the part of the government

showing any intention to reserve this land.  The only inference that can be drawn from the facts is that the government agents, its surveyors, did not consider it of sufficient value to survey. It was not surveyed until about twenty-five years. after the survey of 1831, and not till nearly twenty years after the survey of 1837, when the other islands and the lands upon the west bank were surveyed, thus completing the survey in that region."

The inquiry is reduced then to this, did the court err in holding as matter of law, upon this record, that the grant vested in Lyon and Hastings the title to the particular land in controversy?

In *Hardin* v. *Jordan*, 140 U. S. 371, it was held that grants by the United States of its public lands bounded on streams and other waters, made without reservation or restriction, are to be construed as to their effect according to the law of the State in which the land lies, and the following from the opinion of Scates, J., in *Middleton* v. *Pritchard*, 3 Scammon, 510, 520, was quoted with approval: "Where the government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it.  What will pass, then, by a grant bounded by a stream of water?  At common law, this depended upon the character of the stream, or water.  If it were a navigable stream, or water, the riparian proprietor extended only to high-water mark.  If it were a stream not navigable, the rights of the riparian owner extended to the centre thread of the current. . . . At common law, only arms of the sea, and streams where the tide ebbs and flows, are deemed navigable.  Streams above tide water, although navigable in fact at all times, or in freshets, were not deemed navigable in law.  To these riparian proprietors, bounded on or by the river, could acquire exclusive ownership of the soil, water and fishery, to the middle thread of the current; subject, however, to the public easement of navigation.  And this latter, Chancellor Kent says, bears a perfect resemblance to public highways.  The consequence of

this doctrine is, that all grants bounded upon a river not navigable by common law, entitle the grantee to all islands lying between the mainland and the centre thread of the current. And we feel bound so to construe grants by the government, according to the principles of the common law, unless the government has done some act to qualify or exclude the right. . . . The United States have not repealed the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to, or imposed upon the terms of the ordinary conveyances which they use, except in a few special instances; but these are left to the principles of law, and rules adopted by each local government, where the land may lie. We have adopted the common law, and must, therefore, apply its principles to the interpretation of their grant."

*Hardin* v. *Jordan* was a case from Illinois, and the question was as to the effect of the title granted by the United States along a small lake, in respect of the bed of the lake in front of the land actually described in the grant, and we said, p. 380: "This question must be decided by some rule of law, and no rule of law can be resorted to for the purpose except the local law of the State of Illinois. If the boundary of the land granted had been a fresh-water river, there can be no doubt that the effect of the grant would have been such as is given to such grants by the law of the State, extending either to the margin or centre of the stream, according to the rules of that law. It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines." And see *Packer* v. *Bird*, 137 U. S. 661; *St. Louis* v. *Rutz*, 138 U. S. 226; *Shively* v. *Bowlby*, 152 U. S. 1.

In Michigan the common law prevails, and the rule is sustained by an unbroken line of authorities that a grant of land

bounded by a stream, whether navigable in fact or not, carries with it the bed of the stream to the centre of the thread thereof. *Norris* v. *Hill*, 1 Michigan, 202; *Lorman* v. *Benson*, 8 Michigan, 18; *Rice* v. *Ruddiman*, 10 Michigan, 125; *Ryan* v. *Brown*, 18 Michigan, 196; *Watson* v. *Peters*, 26 Michigan, 508; *Père Marquette Boom Co.* v. *Adams*, 44 Michigan, 403; *Fletcher* v. *Thunder Bay Co.*, 51 Michigan, 277; *Turner* v. *Holland*, 65 Michigan, 453; *City of Grand Rapids* v. *Powers*, 89 Michigan, 94, and many other cases.

In *Mitchell* v. *Smale*, 140 U. S. 406, 412, 413, 414, a similar question to that disposed of in *Hardin* v. *Jordan* arose, and Mr. Justice Bradley, speaking for the court, said: "We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often *the* most valuable, part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation, which ought not to be created or sanctioned. . . . We do not mean to say that, in running a pretended meander line, the surveyor may not make a plain and obvious mistake, or be guilty of a palpable fraud; in which case the government would have the right to recall the survey, and have it corrected by the courts, or in some other way. Cases have happened in which, by mistake, the meander line described by a surveyor in the field-notes of his survey did not approach the water line intended to be portrayed. Such mistakes, of course, do not bind the government. Nor do we mean to say that, in granting lands bordering on a non-navigable lake or stream, the authorities might not formerly, by express words, have limited the granted premises to the water's edge, and reserved the right to survey and grant out the lake or river bottom to other

parties. But since the grant to the respective States of all swamp and overflowed lands therein, this cannot be done. In the present case it cannot be seriously contended that any palpable mistake was made, or that any fraud was committed by the surveyor who made the survey of 1834-5."

We have no doubt upon the evidence that the circumstances were such at the time of the survey as naturally 'induced the surveyor to decline to survey this particular spot as an island. There is nothing to indicate mistake or fraud, and the government has never taken any steps predicated on such a theory; and did not survey the so called Island No. 5 until twenty-five years after the survey of 1831, and nearly twenty years after that of 1837.

Although the facts were wholly different in *Horne* v. *Smith*, *ante*, 40, that case will be found instructive in connection with the questions arising here.

The Supreme Court of Michigan was right in holding that whatever there was of this conformation passed under the grant to Lyon and Hastings.

*Judgment affirmed.*