## WILLETT v. MILLER et al.

No. 24058.    Nov. 26, 1935.

Rehearing Denied March 10, 1936.

Brown Moore and Guy L. Horton, for plaintiff in error.

Wilcox & Swank, for defendants in error.

RILEY, J. This cause involves the title to certain land in Payne county lying south of what was platted as lots 3 and 4, section 9, township 17 N., range 3 E., I. M.

Plaintiff in error obtained patent to lots 3 and 4 in the year 1913. At that time said lots were bounded on the south by the Cimarron river, and as platted contained 14.40 and 26.28 acres, respectively.

The Cimarron river appears to have changed its course through section 9, so that at the time this suit was commenced, the north bank is now more than one-half mile south of where it was when the lots were platted. As a result there is now some 218 acres in the west half of section 9 on the north side of the river and south of the original south line of lots 3 and 4.

Plaintiff claims this land as an accretion to lots 3 and 4, and brought this action to quiet title thereto.

Defendant Grimm owned lots 6 and 7, which originally lay south of lots 4 and 3, respectively, and across the river therefrom.

Defendant Miller owned lot 5, which was immediately south of lot 6, and defendant Wiley owned the E. ½ of the S. E. ¼ of section 9, and the E. ½ of the S. W. ¼ of section 9.

About 218 acres claimed by defendants are now north of the river.

Defendants contend that the change in the river bed was not by slow and gradual process of recession and accretion, but was by avulsion.

Plaintiff also claims title by prescription.

The defendant oil companies claim under lease from defendant.

Trial was had to the court without a jury, resulting in findings against plaintiff on both contentions, and in judgment for defendants, and plaintiff appeals.

The record contains several hundred pages of evidence. Plaintiff presents his many assignments of error under two general propositions, viz., that the findings and judgment are contrary to the evidence and contrary to the law, and that judgment should have been for plaintiff and not for defendants, under the evidence on the question

of nature of cause of the change in the location of channel of the river, and is contrary to law and the evidence on the question of title by prescription.

The question is whether the findings and judgment of the trial court are against the clear weight of the evidence.

It is conceded by both parties that the owners of the land on each side of the river originally owned to the center of the channel.

There is but little if any conflict in the evidence as to the cause of the change in the channel of the river and how it was brought about.

On the whole the evidence shows that from about 1912 to shortly before this suit was commenced, there occurred several floods, those occurring in 1912, and about 1921, being particularly high. That the soil on the south side of the river was a sandy loam, underlaid with quicksand. That in times of extremely high water the current of the river, which was very swift, ran along and against the south bank of the river, and would wash away the quicksand along and under the south bank of the river, and large quantities of the soil would fall into the water and be carried away. Some of the witnesses testified that during one flood, lasting four or five days, as much as 300 feet of the land would be washed away. At one time as much as 25 acres of one of the defendants' land was thus washed away. During the course of the 20 years the change in all amounted to more than one-half mile.

The evidence is less in conflict as to the rapidity of the filling in or building up of the bank on the north side of the river. Some of the witnesses testified that it was by slow and gradual process so as not to be noticeable at any particular time.

But the evidence as a whole shows that in the course of each recurring flood, where a portion of the south bank of the river was washed away a given distance, when the water receded, the north bank of the river would be found to have moved south a corresponding distance, so that the river bed proper kept a comparatively uniform width.

Both parties rely to some extent upon the provisions of the statutes.

Plaintiff in error quotes sections 8556 and 8557, C. O. S. 1921, and contends that section 8556 controls.

Defendants in error quote the above sections, and also section 8561. They contend that section 8557 controls.

Section 8561 does not apply for the reason that it applies only to cases where a stream abandons its ancient course and forms a new course by cutting a completely new channel.

Section 8556 provides:

"Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

Section 8557, supra, provides:

"If a river or stream carries away, by sudden violence, a considerable and distinguishable part of a bank, and bears it to the opposite bank, or to another part of the same bank, the owner of the part carried away may reclaim it within a year after the owner of the land to which it has been united takes possession thereof."

It appears to be conceded that section 8556, supra, is declarative of the common law. So also is section 8561, supra.

The doctrine of accretion and reliction is well established in the common law and has often been held applicable in the several states.

In Jefferies v. East Omaha Land Co., 134 U. S. 178, 33 L. Ed. 872, it is said:

"Alluvion is a latent increase, and that is said to be added by alluvion, whatever is so added by degrees that it cannot be perceived at what moment of time it is added; for although you fix your eyesight upon it for a whole day, the infirmity of sight cannot appreciate such subtle increments, as may be seen in the case of a gourd, and such like.' Blackstone says (2 Com. 262): 'And as to lands gained from the sea, either by alluvion by the washing up of sand and earth, so as in time to make terra firma; or by dereliction, as when the sea shrinks back below the usual water mark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining'."

Accretion is defined as a gradual increase of land by imperceptible degrees; the gradual and imperceptible accumulation of land, etc.. 1 C. J. 730; State of Nebraska v. State of Iowa, 143. U. S. 359, 36 L. Ed. 186. The latter case is cited and relied upon by plaintiff, for it is therein said:

"Frequently, whereabove the loose sub-

stratum of sand there is a deposit of comparatively solid soil, the washing out of the underlying sand causes an instantaneous fall of quite a length and breadth of the superstratum of soil into the river; so that it may in one sense of the term, be said that the diminution of the bank is not gradual and imperceptible, but sudden and visible. Notwithstanding this, two things must be borne in mind, familiar to all dwellers on the banks of the Missouri river, and disclosed by the testimony: that, while there may be an instantaneous and obvious dropping into the river of quite a portion of its banks, such portion is not carried down the stream as a solid and compact mass, but disintegrates and separates into particles of earth borne onward by the flowing waters, and giving to the stream that color which, in the history of the country, has made it known as the 'muddy' Missouri; and, also, that while the disappearance, by reason of this process, of a mass of bank may be sudden and obvious, there is no transfer of such a solid body of earth to the opposite shore, or anything like an instantaneous and visible creation of a bank on that shore. The accretion, whatever may be the fact in respect to the diminution, is always gradual and by the imperceptible deposit of floating particles of earth. There is, except in such cases of avulsion as may be noticed hereafter, in all matters of increase of bank, always a mere gradual and imperceptible process."

It must therefore be conceded that, notwithstanding the rapid washing away of the south bank of the river by the falling into the river of large portions of the bank, rods in width at a time, if the building up of the bank on the north side was by gradual and imperceptible degrees, then the contention of plaintiff must be upheld. But it must be borne in mind that what was said in Nebraska v. Iowa, supra, was based upon testimony, and not upon allegations. For it is therein said: "The case before us is presented on testimony and not on allegation." But what are the facts apparent from that testimony?

In considering that case, then it must be assumed that the evidence there showed a gradual building up of the bank of the river on the west or north side by gradual and imperceptible degrees.

It is true that in the course of the opinion the author says:

"There is, except in such cases of avulsion as may be noticed hereafter, in all matter of increase of bank, always a mere gradual and imperceptible process."

The court in using said expression must have meant to confine the application there-

of to the facts as shown by the testimony in that case, otherwise the doctrine of avulsion could never apply except in cases where the stream cut through the land to form an entirely new channel and completely abandon the old, so as to leave between a portion of land susceptible of identification as the very soil that was in place before the change of the channel. But the doctrine of avulsion is not so limited.

In City of St. Louis v. Rutz, 138 U. S. 226, the doctrine of avulsion is applied in a case very similar in many respects to the one here under consideration.

In Missouri v. Nebraska, 196 U. S. 23, 49 L. Ed. 372, the Supreme Court of the United States points out that:

"It is equally well settled that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed in the law, avulsion."

Therein attention was again called to the quotation from Gould on Waters, par. 159, wherein it is said:

"But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates."

In City of St. Louis v. Rutz, supra, it is held:

"The sudden and perceptible loss of land" of a riparian proprietor, which is visible in its progress, does not deprive him "of his fee in the submerged land, nor change his boundaries" on the river front "as they existed when the land commenced to be washed away," and, "If the bed of a stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but if the change is by reason of a freshet and occurs suddenly, the line remains as it was originally."

It will thus be seen that doctrine of avulsion applies where the bed of a stream changes suddenly and perceptibly by reason of a freshet as well as where the change is by suddenly cutting a new channel through the land, as in the so-called "oxbow" cases.

According to the evidence in this case, the changes in the bed of the Cimarron river were much more sudden than was the

case in the City of St. Louis v. Rutz Case, since in this case the freshets or floods of the river continued over a period of but a few days at a time.

If by the flood of 1912, or by that and subsequent floods, as testified to by the witnesses, the change in the channel of the river was so sudden as to bring it within the rule announced in City of St. Louis v. Rutz, supra, dry land was formed on the north side or bank and extended out beyond the center of the stream, which before formed the north line of defendants' land, then under the rule announced in the Rutz Case, supra, the land thus formed south of where the middle of the stream was before the flood belonged to defendants. Any land added thereto thereafter, either by the slow process of accretion or alluvion, or by sudden and perceptible degree, caused by a flood or freshet, such additional land also belonged to defendants, since they became the owners of the entire width of the river bed when it became so far removed to the south as to be entirely south of the middle of the stream as it originally existed.

Cases are cited which seem to hold that before the doctrine of avulsion may be applied in a case where land of one riparian proprietor is, suddenly, by flood water, washed away, and at the same time and by the same means land is formed along the opposite bank and adjacent to the land of the riparian proprietor on that side of the stream, the owner of the land washed away must be able to follow and identify his soil as the identical soil washed away from his premises, and if he is not able so to do, he must lose. Such is not the true rule. The true rule is that if the change is so sudden that the owner of the land washed away is able to point out approximately as much land added to the opposite bank as he had washed away, the doctrine of avulsion applies, and there is no change in the boundary line. It remains as before, notwithstanding the change in the course of the stream, the center of which formed the boundary line.

It is common knowledge, and common sense teaches, that in such cases particles of soil. sand, gravel, etc., are not carried directly across the current of rapid streams and deposited upon the opposite bank, and for this reason no riparian proprietor could, after a freshet, say with certainty that he could identify the particular particles of soil, sand, and gravel deposited upon the opposite bank of the stream during the freshet as formerly forming a part of his land.

The evidence supports the finding of the trial court that the change in the river bed was by avulsion and not by reliction and accretion.

On the question of alleged title by prescription, plaintiff in his brief asserts that he testified that he had been in actual, open, notorious, peaceable, and undisturbed possession of all the land in dispute, excepting a strip about 30½ rods wide on the east side thereof, for more than 15 years, and that no witness testified to the contrary.

This, of necessity, could not be true as to all the land in controversy. This action was commenced in April, 1930. All the land in controversy could not have been on the north side of the river in April, 1915. The most that plaintiff and his witnesses can say is that he has been in possession of the land north of the river. There is no evidence by which the middle of the channel as it existed in April, 1915, can be definitely located. Much of the change was before, and much after that date. But, as to that part of the land which was north of the river in 1915, mere possession would not establish title.

In Thomas v. Morgan, 113 Okla. 212, 240 P. 735, it is held that a prescriptive right must be adverse and under a claim of right, and that mere permissive use of the lands of another is not adverse and cannot give an easement by prescription.

In Taylor et al. v. Monday et al., 104 Okla. 241, 231 P. 75, it is held:

"In order for one to acquire title to real estate by prescription he must have the adverse possession thereof, which must be open, visible, continuous, and exclusive, with a claim of ownership, such as will notify parties seeking information upon the subject that the premises are not held in subordination to any title or claim of others, but against all titles and claimants."

Therein it is said that this is the uniform rule adhered to in this jurisdiction, as shown by a number of cases cited.

The evidence of plaintiff falls far short of this requirement. There is some evidence to the effect that plaintiff admitted to one of the defendants within the past six or seven years that a part of the land in question belonged to defendants.

Plaintiff admits that some of the defendants were claiming title, and that there was some talk that a suit should be brought to vest the title long after April, 1915.

Defendants were exercising ownership over the disputed land in that they were paying taxes thereon, had leased it for oil and gas, and had been for a number of years collecting rentals therefrom regularly. Of course, the payment of taxes and the execution of oil and gas leases by defendants might have been while plaintiff was at the same time pasturing his stock upon the land and had part of it enclosed by fence.

The evidence fails to show that plaintiff had actual, exclusive, and uninterrupted possession of the land for 15 years, and that he went into possession and held possession under claim of title.

There was no error in holding against plaintiff on the question of title by prescription.

The judgment should be, and is hereby, affirmed.

McNEILL, C. J., OSBORN, V. C. J., and WELCH and CORN, JJ., concur.