STATE ex rel. COM'RS OF LAND OFFICE v. WARDEN et al.

No. 32973.   June 29, 1948.

Rehearing Denied Oct. 12, 1948.

*198 P. 2d 402.*

Lonnie L. Corn, Richard A. Jackson, Roy F. Lewis, and Floyd Wheeler, all of Oklahoma City, for plaintiff in error.

Cook & Bingaman, of Purcell, for defendants and cross-petitioners in error.

GIBSON, J. The parties to this appeal will be designated as they appeared in the trial court, that is, State of Oklahoma on relation of the Commissioners of the Land Office of the State as plaintiff, and Irving C. Ward et al., as defendants.

The litigation began as an action by plaintiff against defendants to foreclose a mortgage held by it on lands of defendants in McClain county, formerly a part of Indian Territory, described as lots 8, 9 and 10 and north half of southwest quarter of southwest quarter and southeast quarter of southwest quarter of southwest quarter of section 36, township 10 north, range 4 west. Plaintiff was awarded default judgment and the property sold at foreclosure sale. Plaintiff became the purchaser, and on confirmation took possession of the premises. On petition of defendants the sale and judgment of foreclosure were subsequently vacated by the court and it was ordered that defendants be permitted to defend and that, upon making good on their proffered tender, they be restored to possession. Plaintiff made supersedeas bond and appealed to this court where the action of the trial court was affirmed (State of Oklahoma ex rel. Com'rs of the Land Office v. Warden et al., 197 Okla. 97, 168 P. 2d 1010).

These lands lie to the south and west of the South Canadian river which formed the boundary line between Indian Territory and Oklahoma Territory and the frontage of said lots was on the river. The portion of section 36 that lay north and east of said river and in what was formerly Oklahoma Territory constituted school land and the title thereto was vested in the plaintiff.

While the petition to vacate was pending, the plaintiff, being desirous of leasing the lands so purchased along

with other lands owned by it, obtained leave of court so to do upon condition that the proceeds thereof be held subject to order of court pending final determination of the action and to abide the judgment therein. Leases were executed and confirmed by the court, and there was realized therefrom in bonus and rentals an aggregate of more than $40,000. Each of the several leases comprised, as a unit, lands claimed by both plaintiff and defendants, with the consequence that the share of each in the amount realized on each lease could be determined only on the basis of their proportionate acreage therein.

Following the affirmance by this court of the vacation of the sale and foreclosure judgment, there arose the question of plaintiff's accounting to defendants for their proportion of the proceeds of the leases less the amount thereof retained by plaintiff in satisfaction of the mortgage indebtedness. The issue thereon involved the location of the boundary line between defendants' lots and the school land of plaintiff, and it is from the judgment of the court thereon that both plaintiff and defendants appeal.

The trial court held that the lots of defendants were riparian and by reason of the nonnavigability of the stream the north and east lines of the lots extended to the center of the channel thereof. The court decreed what was the center line and held that of the 334.2 acres under leases the defendants were owners of 285.5 acres and awarded defendants judgment for the sum of $36,516.85, the corresponding portion of the bonus and rentals received. Both plaintiff and defendants contend that the median line established by the court is incorrect. We deem that question decisive of the appeal.

Plaintiff's first contention challenges the correctness of the judgment that defendants owned any part of the river bed. It is asserted that defendants' title could extend no further than the south bank of the stream for two reasons:

One, that the grant of section 36 to the state as school land carried with it title to the bed of the stream. The other, that by reason of Tit. 64, O. S. 1941 §290, which appropriates to the state streams of two chains or more and the beds thereof, the right of defendants, if any, yielded to the sovereign power of the state. No authorities are cited or argument presented in support of the first ground. And to hold that section 36, in Oklahoma Territory, includes the entire bed of the stream adjacent to said section must rest on the assumption that the bed was wholly within Oklahoma Territory, for which there is no basis in fact. The lots of defendants were a part of the lands patented to the Choctaw and Chickasaw Nations in 1842, and therein the northern boundary was described as " . . . beginning near Fort Smith, where the Arkansas boundary crosses the Arkansas river running thence to the source of the Canadian fork, if in the limits of the United States, or to those limits". Under the Federal rule of construction, which is controlling (George F. Packer v. Jake Bird et al., 137 U. S. 661-673, 34 L. Ed. 819), the river, not being navigable, the middle of the channel became the boundary. Brown v. Huger, 21 How. 305, 16 L. Ed. 125; Brewer-Elliott Oil & Gas Co. v. United States, 260 U. S. 77, 43 S. Ct. 60. The lands of the defendants were duly sold and conveyed by the tribal authorities October 13, 1913, and defendants deraign their title thereto through mesne conveyances from the grantee. In the tribal grant of said lots no mention is made of the river bed but the acreage thereof is based upon the meander lines of the south bank as established by an official survey. That the effect of the grant under the circumstances was no less effective to convey to the riparian grantee title to the middle of the channel is no less clear under both Federal and state authorities. Gertrude H. Hardin v. Conrad N. Jordan, 140 U. S. 371, 35 L. Ed. 428; Phillips Petroleum Co. v. Davis, 194 Okla. 84, 147 P. 2d 135; Braddock v. Wilkins, 182 Okla. 5,

75 P. 2d 1139; Aladdin Petroleum Corp. et al. v. State ex rel., 200 Okla. 134, 191 P. 2d 224.

In support of the second ground of the contention reliance is placed entirely upon the force of Tit. 64, O. S., 1941 §290, to vest title to the river bed in the state notwithstanding the title thereto had passed from the United States and become vested in the Tribe prior to statehood. It is recognized in the argument that under the rule announced in Brewer-Elliott Oil & Gas Co. v. United States, 270 Fed. 100, and affirmed in 260 U. S. 77, 43 S. Ct. 60; United States v. Champlin Refining Co., 156 Fed. 2d 769, and others, wherein navigability is held to be a Federal question, the state would be precluded from asserting title to the bed of the stream against that of the riparian owners, but it is contended that such should not be the state rule. We deem it unnecessary to discuss the argument thereon because, in light of the facts stated, it is clear that the question comes squarely within the principles involved in Aladdin Petroleum Corp. et al. v. State ex rel., supra, which was decided since this cause was briefed. Since we there held that the state under similar circumstances could not by said statutes divest the riparian owner of title to the river bed, we hold that the same is true in this case for the reasons therein stated.

Introduced in evidence was the 1872 U. S. Survey of the stream, the 1899 U. S. Survey of the meander lines of the south bank thereof, and a 1929 unofficial survey of the south bank, and two surveys made in 1946, one at the instance of plaintiff and the other at the instance of defendants, and there was oral testimony. The river traverses section 36 in a southeasterly direction. At the time of the 1872 survey the south or west bank of the stream entered the section slightly north of the center of the west line of the section and emerged through the south line thereof something more than a quarter of a mile west of the southeast corner of the section. At that time the north bank of the stream entered section 25, which lies immediately north of section 36, about ⅛ of a mile north of the northwest corner of section 36, thence eastward and curving sharply southward emerged at the center of the east line of section 36. The 1929 survey which pertains only to the south bank reflects the same as parallel to but more than ⅛ of a mile further northward than the 1899 survey due to accretion. The 1946 surveys, which correspond as to both banks, reflect the south bank as having receded southward due to washing away of a large part of the accretion shown in the 1929 survey. The north bank is reflected as entering section 25 nearly a quarter of a mile further north than in 1872 and thence extending eastward until midway across the section and then southeast passing near center of section 31 which lies immediately east of section 36, with the result that the lands in the northeast of section 36 reflected as riparian lots in the 1872 survey are within the bed of the stream. In the 1872 survey there is designated an "island" lying near and paralleling the north bank through sections 25 and 36. The area thereof is not indicated thereon.

In the finding of the court, it is said:

" . . . the court is of the opinion that the state lost the actual lands in section 36, it owned, more by avulsions than by reason of slow erosion and the court further finds that prior ot the flood of 1903-4, described by the witness Siler, that the east and north bank of the South Canadian River, where it runs through section 36, township 10 north, range 4 west, involved in this action, was substantially in the same location, that is up to that 1903-4 flood, as it was as shown by the 1872 survey and that its recession north was primarily by reason of avulsions in floods that the witness outlined in his testimony. . . . and is of the opinion that the lands between the 1929 survey and the 1899 survey had accreted to lots 8, 9 and 10, but that by a process of avulsions that said lands have been carried

away to the present south bank of the South Canadian River. . . .

"The court further finds that the north and east boundary of said riparian lots 8, 9 and 10 is the center or middle line of the Canadian or South Canadian river, midway between the north and east bank of said river, as established by the U. S. Survey of 1872, and the south or west bank of said stream as established by the Kemp survey of November 1, 1929, . . . .

"The court further finds that as shown by such plat or survey the defendants, . . . are the owners of all the lands in the section 36, township 10 north, range 4 west, McClain county, Oklahoma, south of the center or middle line of said Canadian river as above established except the southwest quarter of the southwest quarter of the southwest quarter owned by third parties not parties to this lawsuit, . . ."

Plaintiff contends that if defendants own to center line of the river, such center is midway between the banks as established by the 1872 survey and that the south bank of the island is to be considered as the north bank. It is further contended that holding as part of defendants' lots all of the river bed in section 36 lying south of the center line as fixed is erroneous because they are entitled to only that portion which is at a right angle to the course of the stream and that the effect thereof is to allot more acreage than that to which they are entitled and hence an undue portion of the funds. Defendants' main contentions are that the boundary is the median line between the cut banks as shown by the 1946 surveys; that defendants are owners of all the leased acreage lying south thereof; and that if there was error in determining the respective amounts of the acreage owned by each, plaintiff was not prejudiced thereby.

It is an established rule that where a nonnavigable stream is made the boundary it is the center of the stream that constitutes the boundary and that apart from changes due to avulsion the boundary continues therein and shifts with the current thereof. Braddock v. Wilkins, supra. And as a corollary thereto it was said by the United States Supreme Court (State of Oklahoma v. State of Texas, 258 U. S. 574, 66 L. Ed 771), in reference to Red river:

"It is without a continuous or dependable flow, has a relatively level bed of loose sand over which the water is well distributed when there is a substantial volume, and has no channel of any permanence other than that of which this sand bed is the bottom. The mere ribbons of shallow water which, in relatively dry seasons, find their way over the sand bed, readily and frequently shifting from one side to the other, cannot be regarded as channels in the sense intended. Evidently something less transient and better suited to mark a boundary was in mind. We think it was the channel extending from one cut-bank to the other, which carries the water in times of a substantial flow. That was the only real channel and therefore the main channel. So its medial line must be what was designated as the Indian boundary."

The rule so declared is no less applicable and controlling in the instant case if the South Canadian river is similar to the Red river in the material aspects. That the South Canadian is a stream of similar type is clearly proven by the evidence and not disputed. And, such being true, it follows that the median line between the cut banks reflected by the 1946 surveys is the boundary line between the properties unless the avulsion relied on for a change is shown, because the avulsion will not be presumed. Chase et al. v. Cheatham et al., 194 Okla. 1, 146 P. 2d 585. In that case the following is quoted with approval from State of Oklahoma v. State of Texas, supra:

" 'The doctrine that a river continues to be a boundary, notwithstanding erosion and accretion, applies . . . notwithstanding that, during periods of high water, the changes in the banks are rapid and material."

It follows from what has been said that, notwithstanding the widening or

narrowing of the channel of the river through erosion and accretion or either, the center thereof remains the line. In State of Nebraska v. State of Iowa, 143 U. S. 359, 36 L. Ed. 186, 190, it was held:

"Our conclusions are that, notwithstanding the rapidity of the changes in the course of the channel, and the washing from the one side and on to the other, the law of accretion controls on the Missouri river, as elsewhere; and that not only in respect to the rights of individual landowners, but also in respect to the boundary lines between states. The boundary therefore, between Iowa and Nebraska is a varying line, so far as affected by these changes of diminution and accretion in the mere washing of the waters of the stream."

The rule is applicable herein unless there is evidence sufficient to support the court's holding that the change was wrought by avulsion. In its literal sense the word "avulsion" means a "tearing apart" or "forcible separation" (Webster), and in such sense may properly denote a cutting away of the bank alone. But as a legal term it is susceptible of no such restricted use. Webster defines its legal definition as follows:

"The sudden removal of land from the estate of one man to that of another by an inundation or a current, or by a sudden change in the course of a river by which a part of the estate of one man is cut off and jointed to the estate of another. The property in the part thus separated continues in the original owner."

The substance of the meaning so expressed is recognized in the State of Nebraska v. State of Iowa, supra, as the interpretation of the word under both the common and civil law.

In the instant case the court refused to find as urged by plaintiff that the stream cut a new channel through the lands of the plaintiff, and did not find that any of plaintiff's land or its equivalent (Willett v. Miller et al., 176 Okla. 278, 55 P. 2d 90) was deposited on defendants' lands. In fact, any such fact is negatived by the court's finding that the extension of the south bank northward was due to accretion. Nor is there any evidence to sustain the theory of avulsion. The testimony of the witness Siler, upon which the court bases the finding of avulsion, goes no farther than to declare that the north bank washed away rapidly in the flood of 1904 and more rapidly then than in subsequent floods. As to the progress of the recession he testified that it was about 1908 or 1910 that the north bank had receded as far north as the section line between sections 36 and 25. When asked whether he knew the present shape was about the same as then the witness replied: "No, I don't know. It builds up, and washes away and keeps changing, I don't know how to answer that." The testimony of other witnesses gives no extraordinary effect to the 1904 flood as compared to other and subsequent floods, and is to the effect that the changes in the banks over the years are due to erosion.

In support of its contention that the south bank of the island is to be deemed the north bank of the river, it is asserted first that what is designated in the 1872 survey as an island was in fact not an island but a part of the land lying north of the river and thus constituted the north bank, and since the remains thereof are still discernible because more elevated than the ordinary bed of the stream, the dividing line is midway between it and the south bank. We deem it unnecessary to consider whether the island still exists and the alleged effect thereof on the boundary as if the same were a part of the main land to the north, both of which is disputed, because we consider there is no basis for the premise that same was a part of the main land and not an island. It is sought to establish the fact upon the testimony of witness Siler who stated there was only a slough between the island and the bank of the stream previous to the flood of 1904. The witness at the time of the trial was 51 years of age and hence only 8 or 9 years of age at the time of the flood.

Even if the existence of the island reflected by the survey was subject to question it could not be successfully predicated upon the testimony of one not born at the time of the survey. The official survey imports a verity and short of obvious mistakes or palpable fraud which would entitle the Government to recall the same and have it corrected by the court it is to be so considered. Grand Rapids and Indiana Railroad Co. v. Butler, 159 U. S. 87, 40 L. Ed. 85; Lehigh Valley Coal Co. v. Beaver Lumber Co., 203 Pa. 544, 53 Atl. 379; Jones et al. v. Johnston, 18 How. 150, 15 L. Ed. 320. In United States v. Hutchings et al., 252 Fed. 841 (aff. 270 Fed. 110. Error dismissed 260 U. S. 753, 67 L. Ed. 497) it is said:

"The assertion that the island had no existence at the date of the original government survey, commenced in 1871 and finished in 1872, is wholly untenable, as it was indicated in the river by the plat and field notes, and its substantial formation is clearly established by the evidence. The island was not meandered or surveyed into lots, but the omission is unimportant, as the engineers generally did not survey islands in the Arkansas river; and the title would not be affected if the island had been entirely ignored. Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. 242, 57 L. Ed. 490, 44 L. R. A. (N. S.) 107; Moss v. Ramey, 239 U. S. 538, 36 Sup. Ct. 183, 60 L. Ed. 425."

The island, as such, not being otherwise legally appropriated, belonged to the state by reason of its location north of the median line of the stream between the main lands that form the banks of the stream (same cases and Tit. 60, O. S. 1941 §338), and its existence does not alter the rule that the boundary is midway between the cut banks.

The trial court held that the leased acreage in the bed of the stream belonging to the defendants was all that in the section which lay south and west of what was deemed to be the center of the stream beginning on the west line of the section and extending to the south line thereof. It is contended by plaintiff that this is error and results in plaintiff having to account to defendants on the basis of acreage not owned by them. In support of the contention it is said that the amount of the river bed belonging to defendants is only that which would be comprised in an area made by extending lines at right angle to the course of the stream from the center line thereof to the northernmost point of defendants' land on the west line of the section and to the easternmost point of their land on the south line thereof, thus leaving at each end of the center line a triangular tract between the section line and the proposed property line which is at right angle to the course of the stream, for which plaintiff should not be held to account. There is no merit in the contention. The plaintiff and defendants own the lands in section 36 and the bed of the stream within the section is as much a part of such ownership as is the upland. Such being true each owns to the point of intersection of the center of the stream and the section line.

There are other matters argued in the briefs but, believing the questions involved therein are in effect disposed of by what has been said, the same will not be discussed specifically.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

HURST, C. J., DAVISON, V. C. J., and ARNOLD and LUTTRELL, JJ., concur.