Olive WHEELER, as Trustee of
the Estate of Donald S.
Wheeler, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 5:89–CV–97.

United States District Court,
W.D. Michigan, S.D.

Aug. 12, 1991.

David W. McKeague, Frank A. Fleisch-
mann, Foster, Swift, Collins & Smith, P.C.,
Lansing, Mich., for plaintiff.

W. Francesca Ferguson, Asst. U.S. Atty., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

### BENJAMIN F. GIBSON, Chief Judge.

This is an action to quiet title to certain real property pursuant to Title 28 United States Code Section 2409a(a). The real property in question is described by defendant United States of America as Tract 39, T. 26 N., R. 10 W., Michigan Meridian, Michigan ("Tract 39"). It is an island approximately .9 acres in size located in Arbutus Lake in Northern Michigan, known locally as Huckleberry Island. Pending before the Court is plaintiff Olive Wheeler's motion for summary disposition pursuant to Federal Rules of Civil Procedure 56(a) and (c).

### I.

The relevant facts are not disputed. On October 8, 1921, title to Tract 39 passed to plaintiff's mother-in-law by way of a warranty deed executed in her favor. Plaintiff holds title to the island as Trustee of her late husband's estate. The island was surveyed for the first time by the Bureau of Land Management ("BLM") in September 1985. The plat of survey was accepted May 2, 1986, and the Deputy State Director of Cadastral Survey determined that Tract 39 was public domain land. By letter dated June 16, 1986, plaintiff protested the finding that the island was public land. This protest was dismissed by a BLM decision dated August 3, 1987. Plaintiff appealed that decision to the Interior Board of Land Appeals ("IBLA"), where the BLM's decision was affirmed on April 27, 1989. This lawsuit seeking to quiet title to the island was filed on November 3, 1989.

Tract 39 is located in Arbutus Lake which itself is located primarily in Section 9, Township 26, Range 10 West. Township 26, Range 10 West of Section 9 was first surveyed by Deputy Surveyors Alvin and Austin Burt in 1839. The subdivisional lines were surveyed by deputy surveyor John P. Allard in 1839, and they were resurveyed by Leonidas S. Scranton in 1852.

The resurvey plat was examined and approved by the Surveyor General on November 4, 1853.

It is uncontested that Tract 39 was not surveyed in either of these surveys. Meander lines were drawn around Arbutus Lake and neither the field notes of the surveys nor the plat make any reference to islands in the lake. Because Section 9 was partially covered with water, it was returned on the plat as a fractional section containing approximately 438.38 acres. Both the 1839 and the 1853 survey were conducted in accordance with the Surveyor General's instruction not to survey islands unsuitable for cultivation. Presumably, that is why Tract 39 was not included in the surveys.

By act of congress dated June 3, 1856, 11 Stat. 21, the federal government granted to the state of Michigan unappropriated public land to aid in the construction of the Grand Rapids and Indiana Railroad from Fort Wayne, Indiana, to Traverse Bay at Petoskey, Michigan. The Act granted the state all odd-numbered lots within six sections (miles) of either side of the railroad line. The six-mile limit on each side of the line is referred to as the "primary" limit.

The grant of Section 9 was made pursuant to the 1856 Act, but it was not a primary grant. Instead, it was made by indemnity selection. That is, the grant was designed to indemnify the state for land within the primary limit which had been disposed of prior to the time the state received complete title. An indemnity selection could be made from odd-numbered sections located outside the primary limit, but no more than 20 miles from the railroad line. The purpose of the selection of Section 9 was to indemnify the state for 438.38 acres of land which it did not receive in the primary grant. The grant of Section 9 was accomplished through two selections, one on June 10, 1864, and another on June 13, 1870.

The Michigan state legislature transferred title in Section 9 to the railroad by acts passed in 1857 and 1865. On or about July 24, 1891, the railroad conveyed Lot 2 of Section 9 to Jonathan W. Cobbs and Wil-

liam W. Mitchell. Lot 2 of Section 9 borders the meander lines of Arbutus Lake. If lines were drawn from the edges of Lot 2 in a pie-shape out to the center of Arbutus Lake, those lines would contain Tract 39.

In 1897 Cobbs and Mitchell conveyed Lot 2 to Henry Stowe and George Hardy who, in turn, conveyed their interest to Tilly Schuknecht. On or about July 12, 1907, Schuknecht conveyed her interest in Lot 2 to Thomas Hansberger. On October 8, 1921, he purported to transfer the island by warranty deed to plaintiff's mother-in-law, Mrs. F.J. Wheeler.

Defendant contends that because the island was never surveyed it did not pass to the state with the conveyance of Section 9. Accordingly, ownership remains in the federal government. Plaintiff asserts that by operation of state law the owner of Lot 2 of Section 9 owned Tract 39 at the time of the indemnity selection by Michigan. She traces her title back to the state's selection and concludes that she is the rightful owner of the land.

## II.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc.,* 668 F.2d 905, 908 (6th Cir.1982). There is no material issue of fact for trial unless, by viewing the evidence in favor of the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Boddy v. Dean,* 821 F.2d 346, 349 (6th Cir.1987). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 572 (6th Cir.1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

## III.

Title 28 United States Code Section 2409a(a) provides that the United States may be named as a party defendant in a civil action to adjudicate a disputed title to real property in which the United States claims an interest. The action presents a federal question and must be adjudicated according to federal law. *Ginsberg v. United States,* 707 F.2d 91 (4th Cir.1983).

In *United States v. Northern Pac. Ry. Co.,* 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210 (1940), the Supreme Court found that an indemnity selection of public lands could not be made from unsurveyed land. The state was required to choose its indemnity selection from odd-numbered sections and, as the Court stated, "Obviously, until surveyed, no odd-numbered sections could exist. Unsurveyed lands are not public lands." *Northern Pac. Ry. Co.,* 311 U.S. at 344, 61 S.Ct. at 276.

This statement does not end the Court's inquiry, however. Although the federal government transferred title to most of the land in the continental United States well before the turn of this century, the question of title to unsurveyed land, especially islands in meandered waterways, remains unsettled. The Supreme Court has reviewed the issue several times under various circumstances and, although there is no clear-cut rule, some basic principles can be gleaned from these cases.

First, in 1891, the court concluded that title to an unsurveyed 80–acre island in a navigable river remained in the United States even after the government transferred title to the adjacent riparian tracts. *Packer v. Bird,* 137 U.S. 661, 673, 11 S.Ct. 210, 213, 34 L.Ed. 819 (1891). The court found that state law applies to "whatever incidents or rights attach to the ownership of property conveyed by the government ... subject to the condition that their rules do not impair the efficacy of the grants, or the use and enjoyment of the property, by the grantee." *Packer,* 137 U.S. at 669, 11 S.Ct. at 212. The court held that under the common law, title to the bed of a navigable river remained in the government. Accordingly, the meander line of the bank of the river determined the boundary of the riparian tract and the owner of that tract could not assume title to an island in the river. However, the court noted that where the river is not navigable, the common law rule is that the holder of the riparian tract also holds title to the bed of the river out to the center of the stream of water. *Id.* at 666, 11 S.Ct. at 210. Although the court did not reach the issue, it is evident that if the river in question had been non-navigable, the riparian owner would have held title to the island.

■ RULE: Where the government has not made any reservations in its grant, under the common law, a riparian owner on a navigable river cannot take title to islands in the river by way of his ownership of the riparian tract.

In the same year as its *Packer* decision, the court found, again, that grants of federal land bounded by streams or other waters without "any reservation or restriction of terms" are to be construed according to state law. *Hardin v. Jordan,* 140 U.S. 371, 384, 11 S.Ct. 808, 812, 35 L.Ed. 428 (1891). Applying the state's common law rules of construction, the court concluded that the riparian owner on the shore of a non-navigable lake took title to the bed of the lake out to the middle of the lake. *Hardin,* 140 U.S. at 401–02, 11 S.Ct. at 818–19. By way of his riparian ownership plaintiff took title to an island described by the court as a "streak or tongue of upland not covered by water at its ordinary height." *Id.* at 374, 11 S.Ct. at 808. The court also cut away at the distinction between navigable and non-navigable waters made in *Packer.* It found that the riparian owner bordering navigable water owned the bed underlying that water subject to an easement of navigability. *Id.* at 384, 11 S.Ct. at 812.

■ RULE: Where the government has not made any reservations in its grant, under the common law, a riparian owner on a lake, without regard to the lake's navigability, takes title to any unsurveyed islands which fall within the area bounded by lines drawn from the edges of the riparian tract to the center of the lake.

Four years later, in *Grand Rapids & I.R. Co. v. Butler,* 159 U.S. 87, 15 S.Ct. 991, 40 L.Ed. 85 (1895), the court held that, absent mistake or fraud on the part of the original surveyor, a riparian owner cannot be divested of title which he takes by operation of common law to an unsurveyed island, by a subsequent survey of the island by the federal government. *Grand Rapids,* 159 U.S. at 94–95, 15 S.Ct. at 993–94. In other words, an unsurveyed island does not remain in the public domain until it is surveyed. This holding is probably limited by the facts of the case though. The court found that the surveyor did not survey the island because it was not of "sufficient value" to survey. *Id.* at 92, 15 S.Ct. at 992. "We have no doubt, upon the evidence, that the circumstances were such at the time of the survey as naturally induced the surveyor to decline to survey this particular spot as an island. There is nothing to indicate mistake or fraud, and the government has never taken any steps predicated on such a theory." *Id.* at 95, 15 S.Ct. at 994. The court also completely abandoned any distinction between navigable and non-navigable waters under the common law. *Id.* at 94–95, 15 S.Ct. at 993–94.

■ RULE: Where an island was not surveyed because it did not appear to be of sufficient value to survey (and not because of mistake or fraud), without regard to the

navigability of the water, the riparian owner cannot be divested of title to the island by way of a later survey.

In *United States v. Mission Rock Co.,* 189 U.S. 391, 23 S.Ct. 606, 47 L.Ed. 865 (1903), the court again addressed the issue of title to unsurveyed islands in navigable waters. The court determined that title to land which rose above the water level in navigable tidal waters remained in the United States. However, the bed of the tidal waters was owned by the riparian landholder by operation of state law. *Mission Rock Co.,* 189 U.S. at 404–05, 23 S.Ct. at 608. The riparian owner was therefore entitled either to reimbursement for the condemnation of that property by the federal government, or to ejectment of the government from the sea bed. *Id.* at 408, 23 S.Ct. at 610.

■ RULE: Title to islands in unsurveyed navigable tidal waters remains in the United States, although ownership of the bed underlying those unsurveyed waters is determined according to state law.

In *Whitaker v. McBride,* 197 U.S. 510, 25 S.Ct. 530, 49 L.Ed. 857 (1905), the court considered who held title to a 22–acre unsurveyed island in the Platte River. The island was unsurveyed despite the surveyor's instructions to survey all islands greater than 21 acres in size. The court determined that the reason for this oversight was that the island had grown in size since the time of the survey due to subsequent dam construction up river from the island. *McBride,* 197 U.S. at 513, 25 S.Ct. at 532. The court concluded that pursuant to state law, the riparian owner held title superior to that of a homesteader who moved onto the island some ten years after the riparian owner gained title to his land. *Id.* at 516–17, 25 S.Ct. at 533. The court relied on *Grand Rapids* for this conclusion, however, it specifically declined to determine whether the United States may have had superior title to the riparian owner. *Id.*

The implication may be that the government held superior title to the island. It was unsurveyed because at the time of the survey it was too small to be surveyed. However, by the time the litigation arose,

if the government chose to survey the island it would have been surveyable pursuant to the Surveyor General's instructions. That is, in a sense it was unsurveyed because of mistake or oversight, an exception mentioned in *Grand Rapids.*

■ RULE: Where the government chooses not to survey an island, by operation of common law a riparian owner's title to that island is superior to anybody else's title, except perhaps the government's.

Three years later the court determined that title to two small islands in the Sault Ste. Marie straits between Lake Superior and Lake Huron was vested in the riparian owner where the United States failed to survey the islands before transferring title to the riparian land to the state of Michigan. *United States v. Chandler–Dunbar Water Power Co.,* 209 U.S. 447, 28 S.Ct. 579, 52 L.Ed. 881 (1908). The islands were "little more than rocks" and were found to be left off the original survey because they were of no apparent value. *Chandler–Dunbar,* 209 U.S. at 451, 28 S.Ct. at 580.

■ RULE: Where the United States fails to survey an island because the island is of no apparent value, title to the island passes to the riparian landholder.

Finally, in *Scott v. Lattig,* 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1913), the Supreme Court found that title to an island more than one mile in length and containing some 138.15 acres of land remained in the United States where it was left unsurveyed through the oversight of the surveyor. The court held that the surveyor had a duty to survey such an island and that a mistake on his part could not divest the government of ownership of the island. *Lattig,* 227 U.S. at 241, 33 S.Ct. at 243. So long as the island was definitely in existence at the time of the survey, title could not pass to the riparian landholders. *Id.* Because the island was not part of the river bed at the time the river was transferred to the state, common law rules regarding ownership of the river bed did not apply. *Id.* at 244, 33 S.Ct. at 244.

■ RULE: Where an island is clearly in existence at the time of survey, and the

surveyor had a duty to survey the island but was negligent in that duty, title to the island remains in the United States.

In *Bourgeois v. United States*, 545 F.2d 727, 212 Ct.Cl. 32 (6th Cir.1976), under facts almost identical to those presented in the instant case, the Sixth Circuit determined that title to an unsurveyed island in a non-navigable Northern Michigan lake passed to the riparian landholders. The court held that where the government's intent is not clear from the face of the patent, title to unsurveyed islands in non-navigable waters passes according to the laws of the state in which the islands are located. The Court distinguished its result from *Lattig* on the basis of the navigability of the water.[1]

### IV.

■ Defendant's first contention is that plaintiff's claim is defeated by the rule of *Northern Pac. Ry.* that indemnity selections may not be made from unsurveyed land. Following this rule, the state of Michigan never held title to Tract 39, and so plaintiff's title is invalid. This reading of the rule, however, ignores the facts of this case. Section 9 *was* surveyed. Under the reasoning of the *Northern Pac. Ry.* court, Section 9 existed at the time of the indemnity selection. The fact that Arbutus Lake was meandered does not overcome this reality. In *Northern Pac. Ry.* the state sought to select "non-existent" sections. There was simply nothing to take title to. That case is factually distinguishable from the present one where the state indisputably took title to Section 9.

Next, defendant asserts that the rules developed in *Mission Rock Co.*, *McBride*, and *Lattig* compel the result that title to Tract 39 remained in the United States. However, the Court's reading of the above cases suggests that by the time *Mission Rock Co.* had been decided, the Supreme Court had fashioned a general common law rule regarding the ownership of islands in

meandered waterways. That rule is that as long as the island remained unsurveyed pursuant to the surveyor's instructions, and not because of fraud or oversight, at the time of transfer from the federal government title to the island vests in the riparian owner without regard to the navigability of the waterway in which the island sits. Each of the cases cited by defendant in support of its argument is consistent with this result.

In *Mission Rock Co.* the court was careful to note that the issue involved tide waters. *Mission Rock Co.*, 189 U.S. at 404, 23 S.Ct. at 608. The development of the common law distinction between navigable and non-navigable waters occurred in England where the only navigable waters were in fact tide waters. In *Grand Rapids* the court noted that in the United States many inland rivers and lakes are navigable, notwithstanding the fact that their waters are not affected by the tides. Accordingly, the court rejected a distinction between navigable and non-navigable waters on that basis. *Grand Rapids*, 159 U.S. at 93, 15 S.Ct. at 993. *Mission Rock Co.* revives that distinction only insofar as tide waters are concerned. This conclusion is bolstered by the subsequent decision in *Chandler–Dunbar* which is factually indistinguishable from *Mission Rock Co.*, except that the islands at issue in *Chandler–Dunbar* were located in fresh water. The court did not discuss the navigability of the water (although the Sault Ste. Marie straits are clearly navigable) and found that the United States passed title to the islands when it patented the riparian tract, without mentioning *Mission Rock Co.*

Defendant asserts that the *McBride* case stands for the proposition that if the government chooses not to survey an island, it may resurvey that island at a later date. The decision not to survey the island does not threaten the government's ownership interest. However, *McBride* involved an island that was not surveyed pursuant

---

1. It is evident that this Court could have avoided much of the analysis undertaken above by relying specifically on the rule established in *Bourgeois*. However, defendant urges that *Bourgeois* was wrongly decided. Upon a review of the case law, the Court believes that although *Bour-*

*geois* reached the correct result, its argument may be somewhat flawed. As discussed below, the important distinction does not appear to be between navigable and non-navigable water, but rather the reason that the island was left unsurveyed.

to the Surveyor General's instructions. The island grew in size after the survey and became large enough to be surveyable under the instructions. The only way to accord the court's language regarding the government's rights to the land with preceding and subsequent case law (*Grand Rapids* and *Chandler–Dunbar* respectively) is to read the surveyor's decision not to survey the island as a mistake. If the surveyor had known the island was a 22–acre island, he was under a duty to survey it.[2]

Finally, the *Lattig* decision clarifies that the surveyor's error in not surveying an island is the key consideration. When a surveyor was under a duty to survey an island that was definitely in existence at the time of the survey, his failure to perform his duty could not work to divest the federal government of ownership. By implication, where the surveyor is under a duty *not* to survey an island, the federal government grants the state the authority to dispose of the property. This result is entirely consistent with *Hardin, Grand Rapids, Mission Rock, Chandler– Dunbar,* and this Court's reading of *McBride.*

As discussed above, in *Bourgeois* the sixth circuit found that the distinguishing characteristic of *Lattig* was that it involved a navigable river. Because the island in *Bourgeois* was in a non-navigable lake, the general rule of *Hardin* applied. However, in noting that the river in question was navigable, the *Lattig* court cited another supreme court decision where the court stated that in either a navigable or non-

navigable case "title to adjoining submerged land will be determined by the law of the state where the land lies." *Hardin v. Shedd,* 190 U.S. 508, 519, 23 S.Ct. 685, 685, 47 L.Ed. 1156 (1903). Moreover, the *Lattig* court determined that land under navigable water passed by operation of state law, the same as land under non-navigable water. *Lattig,* 227 U.S. at 243, 33 S.Ct. at 244. As is evident from *Grand Rapids* and *Chandler–Dunbar,* the Supreme Court's reading of Michigan law is that title to islands rising from the bed of navigable waterways passes to the riparian owner. This is the same rule applied to non-navigable waters.[3]

Under the facts of this case, the surveyor's decision not to survey Tract 39 was not in error. The instructions specified that islands not suitable for cultivation were not to be surveyed. Tract 39 is clearly such an island. Because there was no mistake or fraud in the surveyor's failure to survey the island, it passes by operation of state law. State law is clear that the riparian owner holds title to any unsurveyed islands within the limits of his grant, out to the middle of the lake. *See also Ottawa Shores Home Owners' Ass'n v. Lechlak,* 344 Mich. 366, 73 N.W.2d 840 (1955).

### V.

For the reasons stated above, plaintiff's motion for summary judgment is granted.

---

**2.** Defendant urges that the true distinction is in the nature of the island at the time of the survey. If the island was identifiable as an island at that time, its title remains in the federal government. If the island was more akin to a sand bar or a low marsh, then its title passes to the riparian owner. This distinction relies on a finding that the latter is more analogous to the bed underlying a waterway than to an island. The common law rule is that ownership of the bed passes to the riparian owner. Defendant urges that ownership of a "true" island remains in the United States. However, although the islands in *Grand Rapids* and *Chandler–Dunbar* were small islands, they were definitely above the level of the water. They were no more the "bed" of the waterway than the 22–acre island in *McBride.*

**3.** If the Court reads *Grand Rapids* and *Chandler–Dunbar* to be dealing with something less than "true" islands, then the *Bourgeois* distinction between navigable and non-navigable waters holds true. Arguably, although *Grand Rapids* and *Chandler–Dunbar* dealt with navigable waters, the islands were not really islands, so they passed to the riparian owners. This result, though, ignores the fact that although the islands in those two cases were small, they were islands. In fact, it is evident that in both cases the islands were larger than Tract 39. Rather than emphasizing the size of the islands involved, *Grand Rapids* and *Chandler–Dunbar* rely on the surveyor's reason for not surveying the islands and reject the distinction between navigable and non-navigable waters.